UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ABDULLAH ("ABE") FATTAEY )
                                )
           Plaintiff, )
                                )
vs. )
                                )
KANSAS STATE UNIVERSITY )
KIRK SCHULZ )      Case No. 2:15-cv-09314-JAR-KGG
CINDY BONTRAGER )
APRIL MASON )
RYAN SWANSON )
ROBERTA MALDONADO FRANZEN )
                                )
           Defendants. )

## FIRST AMENDED COMPLAINT

Plaintiff complains against the above named Defendants as follows:

## I.    THE PARTIES.

1.      Plaintiff is a citizen of the United States and resident of Manhattan, Riley County, Kansas.

2.      Defendant Kansas State University (hereinafter "KSU") is a state university acting under the color of state law with its primary campus located in Manhattan, Kansas.[1]

3.      Defendant Kirk Schulz is a citizen of Manhattan, Riley County, Kansas and was, at all times pertinent hereto, the President of KSU and had a direct and substantive role in making decisions with respect to Plaintiff's employment at KSU and Plaintiff's complaint of age and race discrimination.

---

[1]  Plaintiff will be seeking to amend this Complaint to add Title VII race, age, and retaliation claims against KSU, which claims are currently pending with the Kansas Human Rights Commission and EEOC.

4.     Defendant Cindy Bontrager is a citizen of Holton, Jackson County, Kansas and was, at all times pertinent hereto, Plaintiff's direct supervisor and Interim Vice President of KSU and had a direct and substantive role in making decisions with respect to Plaintiff's employment at KSU and Plaintiff's complaint of age and race discrimination..

5.     Defendant April Mason is a citizen of Manhattan, Riley County, Kansas and was, at all times pertinent hereto, the KSU Provost and Senior Vice President and had a direct and substantive role in making decisions with respect to Plaintiff's employment at KSU and Plaintiff's complaint of age and race discrimination..

6.     Defendant Roberta Maldonado Franzen is a citizen of Manhattan, Riley County, Kansas and was, at all times pertinent hereto, the Interim Director of the KSU Office of Affirmative Action and had a direct and substantive role in making decisions with respect to Plaintiff's employment at KSU and Plaintiff's complaint of age and race discrimination..

7.     Defendant Ryan Swanson is a citizen of Manhattan, Riley County, Kansas and was, at all times pertinent hereto, Associate Vice President for Planning and Facilities Management for KSU and had a direct and substantive role in making decisions with respect to Plaintiff's employment at KSU and Plaintiff's complaint of age and race discrimination.

## II.     JURISDICTION AND VENUE.

8.     The jurisdiction of the Federal Court is invoked because the claims of the Plaintiff arise under the statutes and laws of the United States, namely 42 U.S. Code §§ 1983, 1985(3), and 1988.

9.      Venue in the United States District Court for the District of Kansas is proper because Kansas is where the claims arose.

10.     Pendant jurisdiction of the Federal Court over Plaintiff's claims under State law is proper as those claims arise out of the same nucleus of operative facts that comprise Plaintiff's claims under federal law.

## III.   STATEMENT OF FACTS.

11.     Plaintiff was born and lived in Iran until he graduated from high school.

12.     Plaintiff came to the United States in 1968 to attend college at KSU.

13.     Plaintiff is Muslim, he speaks Farsi (Persian) and English, he talks with a Persian accent, and he was 63 years old in October of 2013.

14.     Through his education at KSU, Plaintiff became a licensed professional engineer, a licensed architect, and received a Master's degree in Regional and Community Planning.

15.     Beginning in 1971, Plaintiff held the following positions as an employee of KSU:

   a.   Part-time employee in Campus Planning and Development Department, 1971-1973.

   b.   Engineering Technician III, 1973-1979.

   c.   Engineering Manager, 1979-1989.

   d.   Senior Facilities Planning Manager/University Engineer, 1989-1996.

   e.   Associate Director/University Engineer, 1996-2006.

   f.   Director and University Architect, 2006-2014.

3

16.     In the 1970s, KSU assisted Plaintiff in becoming a United States Citizen, which he remains today.

17.     As indicated in KSU's annual performance evaluations of him, Plaintiff always at least met KSU's performance expectations (and the majority of the evaluations indicate he exceeded expectations).

18.     Defendant Schulz (Caucasian and American born), became KSU President in 2009.

19.     In May of 2012, Plaintiff was given his Performance Evaluation for Calendar Year 2011 by his former KSU supervisor Edward Rice, wherein he was given a rating of "A – Exceeds Expectations", and was told "You do a great job", "your ability to work with supervisors and the Vice President of Administration and Finance speak highly of your capabilities", and "You are a leadership example to the Facilities Planning Operation".

20.     In October of 2012, Defendant Bontrager (Caucasian and American born) was named as an Interim Vice President by President Schulz and it was at this time she became Plaintiff's direct supervisor.

21.     At the time Defendant Bontrager was named Interim Vice President for Administration and Finance with oversight over the Campus Planning and Facilities Management Department, Plaintiff was the "face" of the Department, he managed all building projects throughout the KSU Manhattan campus, and, in doing so, had constant interaction and communication with Departments throughout KSU, and outside contractors and inspectors working on the building projects.

22.     At the time she was named Interim Vice President for Administration and Finance with oversight over the Campus Planning and Facilities Management Department, Defendant Bontrager had no prior experience with the Department, or with engineering or architecture, rather, she previously worked in the KSU Budget Office.

23.     Despite having no experience in the Campus Planning and Facilities Management Department or with Plaintiff's work, day-to-day duties, job performance, education, abilities, or training, Defendant Bontrager was selected by Defendant Schulz to manage and evaluate Plaintiff.

24.     At the time Defendant Bontrager became his direct supervisor, Plaintiff did not complain or otherwise indicate that he objected to or had an issue with reporting to Bontrager.

25.     In April of 2013, Plaintiff was formally nominated by one of his colleagues [David McMullen, Assistant University Architect] to become the Associate Vice President for Campus Planning and Facilities Management at KSU. (*See* **Exhibit A**).

26.     Mr. McMullen's nomination was consistent with what the former Vice President of KSU, Bruce A. Shubert, had told Plaintiff, specifically that Plaintiff should be the next Associate Vice President for Campus Planning and Facilities Management.

27.     A significant portion of Plaintiff's career with KSU was devoted to him (Plaintiff) striving to be the next Associate Vice President for the Division of Facilities, which he would be in a position to receive once the current person in the position  --  who was Edward Rice at the time  --  retired.

28.     McMullen's nomination of Plaintiff for the position of Associate Vice President for Campus Planning and Facilities Management was the natural next step in Plaintiff's progression to the Associate Vice President for the Division of Facilities.

29.     Former KSU Vice President Shubert (before he retired) was aware of Plaintiff's desire and working toward the position of Associate Vice President for the Division of Facilities, and he was supportive of it happening based on Plaintiff's many years of exemplary service to KSU.

30.     Defendants Schulz, Mason, and Bontrager were also aware of Plaintiff's desire and likely progression to the position Plaintiff was nominated for by McMullen, and then thereafter to the position of Associate Vice President for the Division of Facilities.

31.     Defendants Schulz, Mason, and Bontrager were opposed to Plaintiff becoming the Associate Vice President for the Division of Facilities, and  --  because they knew Plaintiff becoming Associate Vice President for Campus Planning and Facilities Management would solidify Plaintiff as next in line for the Associate Vice President of Division of Facilities  --  they undertook concerted planning and action to ensure Plaintiff was not selected for the position of Associate Vice President for Campus Planning and Facilities Management.

32.     The normal process for Plaintiff to become the next Associate Vice President for Campus Planning and Facilities Management would have been the KSU President appointing him to the position.

33.     Instead, Defendants Schulz, Mason, and Bontrager formed their own selection committee for the position Plaintiff had been nominated for [and they selected a person they

knew would not support Plaintiff for the position as the Search Committee Chair -- Tim de Noble (Dean of the College of Architecture, Planning and Design)], and then sought applications for the position, to include applications from candidates outside of KSU.

34.     And despite Plaintiff's long tenure and superior performance with KSU, Defendants Schulz, Mason, and Bontrager treated Plaintiff as a new applicant for employment and imposed the requirement that he formally submit an application for the position.

35.     The plan by Defendants Schulz, Mason, and Bontrager was that Plaintiff would be excluded from the position based on the pretextual reason that other applicants were better qualified, or performed better in the selection process.

36.     Understanding this, and knowing what Defendants Schulz, Mason, and Bontrager were doing was different from the typical procedure and was meant to exclude him, Plaintiff did not submit a formal application.

37.     On June 4, 2013, Plaintiff was provided, as he had been provided each year before, a "Regular Appointment" contract for the upcoming year. (*See* **Exhibit B**).

38.     Shortly after Defendant Bontrager became Plaintiff's supervisor, Bontrager indicated to Plaintiff that her plan was for Plaintiff to report to the new Associate Vice President for Campus Planning and Facilities Management, but she indicated her plan, in her opinion, would be a good thing for Plaintiff because the new Associate Vice President for Campus Planning and Facilities Management would take over all of the public appearances, as well as interactions, communications, and activities with other KSU Departments

(formerly part of Plaintiff's duties), and, thus, Plaintiff would have more time to do behind-the-scene work and projects.

39.     But when Plaintiff saw the advertisement for the new Associate Vice President for Campus Planning and Facilities Management, it described all of Plaintiff's job duties almost verbatim, and there was no indication or reference to Plaintiff sharing in the job duties.

40.     As expected, Plaintiff was not selected for the position that he had been nominated for [Associate Vice President for Campus Planning and Facilities Management], and that he was highly qualified to receive.

41.     The person selected for the Associate Vice President for Campus Planning and Facilities Management was an applicant from Nebraska, Ryan Swanson (Caucasian and American born), who was significantly younger and less qualified for the position than Plaintiff.

42.     Months before Swanson was hired, Defendant Bontrager asked Plaintiff if he thought he (Plaintiff) was not liked [which Plaintiff presumed she was referring to Defendants Schulz and Mason not liking him] because of his accent, and being from a different country, culture and background.

43.     Within weeks after Defendant Swanson started at KSU, Defendant Bontrager told Plaintiff that he (Swanson) didn't believe Plaintiff was needed at KSU any longer.

44.     KSU has a University Policy that addresses and applies to the annual reappointment process of Administrative employees such as Plaintiff:

> The University has a significant obligation and responsibility to appointees in this category who have completed five years of employment and

who have performed well and have made a high-caliber contribution to the university. Therefore, such appointees may expect to be reappointed for each subsequent fiscal year unless program discontinuance or financial stress results in elimination of the position or a performance evaluation results in non-reappointment. The person must be given 12 months' notice if he/she is not to be reappointed. Should the position be terminated because of program discontinuance or financial stress, the university will make every effort to place the occupant in another suitable position.

(*See* **Exhibit C**).

45.     KSU also has a policy on changes to employment contracts, which policy states the following:

Any contracts with changes in conditions of employment, including title changes, must be submitted with a letter of explanation/justification to the Affirmative Action Office. The Affirmative Action Office will then issue an initial contract.

46.     On September 23, 2013, Defendant Bontrager provided Plaintiff with an already signed document titled "2012 Calendar Year Evaluation", which indicated Plaintiff had "Met Expectations" for year 2012.

47.     During her meeting with Plaintiff on September 23, 2013, Defendant Bontrager also gave Plaintiff a letter dated September 23, 2013, indicating the letter and an attached "Terminal Contract" was notification to him that his employment at KSU would end on September 26, 2014. (*See* **Exhibit D**).

48.     Defendant Bontrager gave no indication to Plaintiff that he could contest her September 23, 2013 notification of termination, or that she would provide him a hearing or otherwise explain to him why his KSU employment was ending.

49.     As contemplated by the KSU policy set forth in Paragraph 44 hereinabove, Plaintiff had an expectation (based on KSU's contractual promise in the policy) of being

reappointed for the 2014 fiscal year, and subsequent years, by Defendants Schulz, Mason, Swanson, and Bontrager as he was meeting the expectations of KSU [even Defendant Bontrager's performance evaluation indicated he was a "Meets Expectations"], and all of his performance evaluations prior to Bontrager's indicated he was meeting, and most years exceeding, KSU's expectations.

50.     As contemplated by the KSU policy set forth in Paragraph 44 herein above, Plaintiff had an expectation (based on KSU's contractual promise in the policy) of being reappointed by Defendants Schulz, Mason, Swanson, and Bontrager for the 2014 fiscal year, and subsequent years, as there was no "program discontinuance" or "financial stress" that "result[ed] in elimination of [Plaintiff's] position". (Brackets added).

51.     As contemplated by the KSU policy set forth in Paragraph 44 herein above, Plaintiff had an expectation (based on KSU's contractual promise in the policy) that Defendants Schulz, Mason, Swanson, and Bontrager would "make every effort to place [Plaintiff] in another suitable position." (Brackets added).

52.     Prior to changing Plaintiff's contract from "Regular Appointment" to "Terminal Contract", Defendants Schulz, Bontrager, Mason, and Swanson did not follow the Policy stated in Paragraph 45 herein above, nor did any of those same Defendants consult with, or get authorization from, the Affirmative Action Office about changing Plaintiff's contract.

53.     During the September 23, 2013 meeting, Defendant Bontrager did not offer any specific performance problems or complaints with Plaintiff, rather she indicated "they

[Defendants Schulz and Mason] want change, and you don't fit in", "they want their own people", "Not a discipline issue, it is time for a change". (Brackets added).

54.     Wanting to at least make it appear he was ending his employment of roughly 40 years at KSU with dignity (i.e. by retiring, something Plaintiff had not planned to do), Plaintiff asked Defendant Bontrager [during the September 23, 2013 meeting] if he could at least work until he turned 65 years of age, to which she indicated she would consider it and get back with him.

55.     On October 1, 2013, Plaintiff submitted a claim of age and race discrimination with KSU's Office of Affirmative Action [now titled "Office of Institutional Equity"], which claim was based on the notice he had received that his employment at KSU was being terminated. (*See* **Exhibit E**).

56.     KSU's policy on discrimination requires that discrimination complaints be investigated, that no retaliation will occur for making complaints of discrimination, and that remedial actions will be taken. (*See* **Exhibit F**).

57.     It is KSU's policy that the only recourse that an employee has for a claim of a discriminatory dismissal is through KSU's Office of Affirmative Action [now titled "Office of Institutional Equity"]:

> Any allegation that the demotion, suspension without pay, or dismissal of a USS employee was discriminatory in violation of University policy must be brought by the USS employee to the Office of Institutional Equity under PPM Chapter 3010, which provides the exclusive procedure within the University for reviewing discrimination claims, and may not be raised on appeal before the USS Appeals Board.

58.     Nothing in KSU's policy on discrimination indicates that KSU executives (such as Defendants Schulz, Bontrager, Swanson, and Mason) are not subject to the discrimination policy or that, when complaints are made against such executives, that KSU's Office of Affirmative Action will refrain from investigating the complaint.

59.     On October 1, 2013, Defendant Bontrager  --  in response to an email from Plaintiff about whether she had reconsidered the decision to terminate  --  emailed Plaintiff [and copied Defendants Schulz and Swanson] to set up a meeting with her and Swanson to "discuss [Plaintiff's] role within the Planning Office over the next year."

60.     In response to Bontrager's October 1, 2013 email, Plaintiff [approximately two hours after receiving Bontrager's email] informed Defendants Bontrager and Schulz that he was pursuing a formal complaint against them [through the Affirmative Action Office] because of their discrimination against him.

61.     On October 7, 2013, Plaintiff raised concerns with Defendant Franzen that the policy under which Plaintiff's discrimination complaint would be processed would involve Defendants Schulz and Bontrager as decision makers, the final decision maker being Defendant Schulz, and there being no provisions for any appeal of Defendant Schulz's decision on Plaintiff's discrimination complaint.

62.     On October 8, 2013, and without starting any investigation, Defendant Franzen informed Plaintiff that since his allegations of discrimination were against Defendants Schulz and Bontrager, he should contact the Kansas Human Rights Commission.

63.     Defendant Franzen, on October 10, 2013, indicated the following with respect to Plaintiff's discrimination complaint and his concern about the process of handling the complaint:

> Given that your allegations of discrimination encompass both President Schulz and Vice President of Administration and Finance City Bontrager, you should contact the Kansas Human Rights Commission to file a complaint of discrimination, rather than participating in our process as described in the Policy Prohibiting Discrimination, Harassment, and Sexual Violence. I am not aware of any other university policies or procedures that would apply to your allegations of discrimination.

64.     Other than telling Plaintiff he could pursue his complaint with the Kansas Human Rights Commission, Defendant Franzen did nothing with or about Plaintiff's complaint of discrimination.

65.     In fact, Defendants Schulz, Mason, Bontrager, Swanson, and Franzen didn't even acknowledge or log Plaintiff's complaint as part of KSU's mandatory reporting duties. (*See* **Exhibit G**).

66.     KSU's policy indicates the following as to responsibilities by management once they are made aware of a discrimination complaint:

> KSU's Supervisors and administrators must report complaints to the Office of Institutional Equity ("OIE") immediately upon notification (including by email if after regular business hours), keep complaints confidential, protect the privacy of all parties involved in a complaint, and prevent or eliminate discrimination, harassment or retaliation; failure to do so is a violation of this Policy.

67.     Defendants Schulz, Mason, Bontrager, Swanson, and Franzen reported Plaintiff's discrimination complaint to no one, and they did nothing to prevent or eliminate discrimination or retaliation toward Plaintiff.

68.     On October 10, 2013, Defendant Bontrager held another meeting with Plaintiff, this time with Defendant Swanson in attendance, wherein she indicated she had decided not to change her decision to end Plaintiff's employment at KSU, and she provided him official notification that his last day of employment would be October 13, 2014. (*See* **Exhibit H**).

69.     Defendants Swanson and Bontrager made clear in the October 10, 2013 meeting that they were upset with Plaintiff, which Plaintiff interpreted as retaliation for making his complaint of discrimination.

70.     In the October 10, 2013 meeting, Defendants Swanson and Bontrager indicated they "could not move forward with change" if Plaintiff stayed at KSU so they indicated he had three days (until Sunday) to pack up his personal belongings and leave the campus.

71.     Despite earlier indicating Plaintiff would report to Defendant Swanson, on October 10, 2013 Defendant Bontrager indicated to Plaintiff that he would continue to report to Bontrager but "[a]t this time there are no projects or work for you to complete", and then went on to say that Plaintiff "must make [himself] available for projects as they arise and are assigned to [him]", but he was "not required to be on campus and will not be penalized for not being present at K-State each work day." (Brackets added).

72.     Although Defendant Bontrager phrased her October 10, 2013 email message to Plaintiff in a way that suggested Plaintiff did not *have to* be on campus for fiscal year 2014, Defendants Bontrager and Swanson made it clear in the October 10, 2013 meeting that Plaintiff needed to leave the campus, and he was not wanted on campus in the future.

73.     Differently than the way Caucasian, American born employees were treated, Defendants Schulz, Bontrager, Mason, and Swanson made no effort to celebrate or congratulate Plaintiff on his many years and accomplishments at KSU, no announcement was made  --  publicly or to Plaintiff's KSU colleagues  --  as to why Plaintiff was forced to leave the campus and discontinue his work for KSU.

74.     Just a few months after he started with KSU, and following Plaintiff being told to leave the KSU campus, Defendant Swanson was elevated by Defendants Schulz, Mason, and Bontrager to the position of Associate Vice President for the Division of Facilities, the same position Plaintiff was being groomed for before Defendants Schulz, Bontrager, Mason, and Swanson got involved.

75.     When Defendant Swanson was selected for the position of Associate Vice President for the Division of Facilities, the position was not advertised for or posted, rather the position was simply given to Defendant Swanson by Defendants Schulz, Bontrager, and Mason.

76.     As such, Plaintiff was not allowed to apply for the position, and he otherwise was not considered for it.

77.     On or before September of 2014, Defendants Schulz, Bontrager, Mason, and Swanson decided to advertise for the hiring of an employee to perform the duties that Plaintiff previously performed, and they gave the position the title of "Director/Planning, Projects and Space Management".

78.     Defendants Schulz, Bontrager, Mason, and Swanson intentionally left out of the job description the duty of "University Architect" so they would have something to

point to in order to say this was a different position than the position Plaintiff was fired from.

79.     Given that the duties and skills required of the position described in the preceding Paragraph were all things that he possessed and had previously performed, Plaintiff applied for the position.

80.     Defendants Schulz, Bontrager, Mason, and Swanson, despite knowing Plaintiff had applied for the position and was the most qualified of all applicants, directed that Plaintiff's application be ignored, Plaintiff be given no response to his application, and that Plaintiff not be considered for the position.

81.     The person hired for the position (Caucasian and American born) was significantly less qualified for the position than Plaintiff, she had no experience as a University Architect, no experience in a university setting, and had previously worked for the State of Kansas reviewing plans for code compliance.

82.     Soon after she participated with Defendants Schulz, Mason, and Swanson in getting Plaintiff removed from the employment he held at KSU for nearly 40 years, and ensuring he (Plaintiff) would not be present on campus, Defendant Schulz elevated Defendant Bontrager from her "Interim" status to the permanent "Vice President for Administration and Finance and Chief Financial Officer", effective December 15, 2013, and authorized a 12-month salary of $235,000. (*See* **Exhibit I**).

83.     During Plaintiff's time working under Defendant Bontrager, she repeatedly told him Defendants Schulz and Mason did not like him (but never specified a reason why),

wanted him removed, wanted change, and they believed Plaintiff would not fit in with the change they wanted.

84.     In all his years working at KSU, the people who held the positions of President and Provost, prior to Schulz and Mason, developed a relationship with Plaintiff, and regularly communicated with him, but Defendants Schulz and Mason never even attempted to do this, and purposefully avoided any contact or interaction with Plaintiff.

85.     Defendants Schulz, Mason, Bontrager, Swanson, and Franzen engaged in the actions described hereinabove because they did not like Plaintiff's Iranian, Middle East, and Muslim ethnicity and race, and they believed these characteristics of Plaintiff were not a good fit for such public and influential positions at KSU, and Plaintiff's racial and ethnic characteristics were viewed unfavorably by certain KSU employees, faculty, contractors, members of the Board of Regents, alumni, Kansas State legislators, donors, and other people or entities affiliated with KSU that interacted with Defendants Schulz, Mason, Bontrager, Swanson, and Franzen.

86.     After learning of Plaintiff's complaint to the Office of Affirmative Action [now titled "Office of Institutional Equity"], Defendants Schulz, Mason, Bontrager, Franzen, and Swanson retaliated against Plaintiff by doing nothing to address or investigate his complaint, telling him the only process available for his discrimination complaint was one that would involve Defendants Schulz and Bontrager as decision makers, and that he should instead pursue his complaint elsewhere.

87.     After learning of Plaintiff's complaint to the Office of Affirmative Action, Defendants Schulz, Mason, Bontrager, and Swanson retaliated against Plaintiff by instructing

him to vacate his office and leave the KSU campus, and then excluded him from any projects, work, interactions and communications with KSU staff that, prior to his complaint, were a regular part of his job.

88.     After learning of Plaintiff's complaint to the Office of Affirmative Action, Defendants Schulz, Mason, Bontrager, and Swanson retaliated against Plaintiff by making no efforts to find him a suitable but different position at KSU, as required by KSU policy.

89.     After learning of Plaintiff's complaint to the Office of Affirmative Action, Defendants Schulz, Mason, Bontrager, and Swanson retaliated against Plaintiff by failing to communicate to Plaintiff's KSU colleagues, the KSU community  --  and people outside of KSU that had worked with Plaintiff on KSU projects  --  as to why Plaintiff was abruptly terminated and removed from campus, thereby creating the specter that Plaintiff had engaged in serious misconduct or  unlawful behavior.

90.     Plaintiff's reputation and good name in the KSU community, and the community of Manhattan, Kansas, has been severely and permanently damaged, and this has prevented him from finding other comparable employment.

91.     Plaintiff has suffered severe and continuing mental distress over being fired, over how his firing was handled, over what motivated his firing, and over never having been provided a truthful reason for why he was fired.

92.     Plaintiff has suffered lost wages and benefits because of the decisions by Defendants Schulz, Mason, Bontrager, Franzen, and Swanson.

## IV.     PLAINTIFF'S FIRST CAUSE OF ACTION: BREACH OF CONTRACT AGAINST KSU UNDER STATE LAW.

93.     Plaintiff incorporates all of the Paragraphs stated herein above.

94. Plaintiff entered into an employment contract with KSU, which contract indicated it was "subject to all . . . rules, regulations and policies of Kansas State University".

95. KSU's policy [set forth in Paragraph 44 herein above] made a contractual promise to Plaintiff that -- absent "program discontinuance" , "financial stress result[ing] in elimination of the position", or "a performance evaluation result[ing] in non-reappointment" -- he was entitled to be reappointed to his position with KSU. (Brackets added).

96. With respect to Plaintiff's position, there was no "program discontinuance" for purposes of KSU's policy recited in Paragraph 44 herein above.

97. With respect to Plaintiff's position, there was not "financial stress result[ing] in elimination of [Plaintiff's] position" for purposes of KSU's policy recited in Paragraph 44 herein above. (Brackets added).

98. With respect to Plaintiff's position, there was not "a performance evaluation result[ing] in non-reappointment" of Plaintiff for purposes of KSU's policy recited in Paragraph 44 herein above. (Brackets added).

99. In addition to KSU's contractual promises, it had reappointed Plaintiff for decades and, pursuant to all of KSU's performance criteria and evaluations, Plaintiff always met the expectations of KSU, thereby creating an expectation and belief in Plaintiff that he would continue to be reappointed by KSU.

100. KSU's policy [set forth in Paragraph 44 herein above] made a contractual promise that KSU would "make every effort to place [Plaintiff] in another suitable position." (Brackets added).

101.    Despite the above contractual promises and past practice, KSU did not reappoint Plaintiff, and KSU did not make any effort to place Plaintiff in another suitable position, thereby causing him compensatory damages.

102.    KSU's policy [attached as **Exhibit J**] contains a comprehensive list of contractual promises that KSU made to Plaintiff with respect to him reporting what he in good faith believed was unlawful discrimination.

103.    Plaintiff made a good faith report of age and race discrimination pursuant to KSU's policy.

104.    But despite the above-referenced promises by KSU as to what it would do upon receiving such a complaint, KSU did nothing with Plaintiff's complaint other than to tell him he should pursue his complaint with an outside agency, and further instructed him that there were no other policies or procedures he could avail himself of through KSU.

105.    Because of KSU's and Franzen's inaction as to Plaintiff's complaint of discrimination, Defendants Schulz, Bontrager, Mason, and Swanson proceeded unabated with their discriminatory dismissal and retaliation of Plaintiff, thereby causing Plaintiff damages.

WHEREFORE, Plaintiff seeks judgment against Defendant KSU for compensatory damages in excess of $75,000 for KSU's breach of contract, and reinstatement to the position he held before KSU's breaches (or another comparable and suitable position at KSU), lost future wages and benefits, costs, and for such other and further relief as the Court deems just and equitable.

## V.   PLAINTIFF'S SECOND CAUSE OF ACTION: CIVIL CONSPIRACY AGAINST DEFENDANTS SCHULZ, MASON, BONTRAGER, AND SWANSON UNDER STATE LAW.

106.    Plaintiff incorporates all of the Paragraphs stated herein above.

107.    Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities and outside the scope of their employment with KSU, had as their common purpose to terminate Plaintiff's employment, and foreclose any other KSU employment, so that the influential position Plaintiff held in September of 2013, as well as the influential positions he was expected to ascend to [Associate Vice President for Campus Planning and Facilities Management and thereafter Associate Vice President for the Division of Facilities] would not be occupied by an Iranian Muslim.

108.    Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities and outside the scope of their employment with KSU, gathered, schemed, and fabricated reasons for terminating Plaintiff, and foreclosing him from any other KSU positions, in order to conceal their common purpose set forth in the preceding paragraph.

109.    Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities and outside the scope of their employment with KSU, carried out the purpose of their conspiracy by terminating Plaintiff's employment on October 10, 2013, and thereafter refusing to consider him for any other KSU positions.

110.    In engaging in the civil conspiracy against Plaintiff, Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities and outside the scope of their employment with KSU, acted with malice and in reckless disregard of Plaintiff's rights, and engaged in willful, wanton, and fraudulent conduct by fabricating reasons for termination

and for not considering him for other suitable KSU positions, and concealing the real reason for termination and for not considering him for employment at KSU.

111.    Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities, are liable to Plaintiff for compensatory damages, including lost wages and benefits, emotional distress damages, punitive damages, and prejudgment and post judgment interest.

WHEREFORE, Plaintiff seeks judgment against Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities, for compensatory and punitive damages in excess of $75,000 for Civil Conspiracy, reinstatement to the position he held before his termination (or another comparable and suitable position at KSU), lost future wages and benefits, costs, and for such other and further relief as the Court deems just and equitable.

## VI.    PLAINTIFF'S THIRD CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS EXPECTANCY AGAINST DEFENDANTS SCHULZ, MASON, BONTRAGER, AND SWANSON UNDER STATE LAW.

112.    Plaintiff incorporates all of the Paragraphs stated herein above.

113.    Plaintiff had a contract of employment with KSU, and a business expectancy that said contract would be renewed for years into the future, as it had been for decades before.

114.    Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities, were knowledgeable of Plaintiff's contract and the expectancy that said contract would be renewed for years into the future.

115.     Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities and outside the scope of their employment with KSU, procured KSU to breach its contract with Plaintiff, and to foreclose Plaintiff from the future expected renewals of said contract.

116.     Defendants Schulz, Mason, Bontrager, and Swanson had no legal justification for their actions in procuring the breach of Plaintiff's contract, and procuring KSU's cessation of future renewals of Plaintiff's contract.

117.     Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities, are liable to Plaintiff for compensatory damages, including lost wages and benefits, emotional distress damages, punitive damages, and prejudgment and post judgment interest.

WHEREFORE, Plaintiff seeks judgment against Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities, for compensatory and punitive damages in excess of $75,000 for Tortious Interference with Contract and Business Expectancy, reinstatement to the position he held before his termination (or another comparable and suitable position at KSU), lost future wages and benefits, costs, and for such other and further relief as the Court deems just and equitable.

## VII.   PLAINTIFF'S FOURTH CAUSE OF ACTION: CONSTITUTIONAL AND CIVIL RIGHTS VIOLATION PURSUANT TO 42 U.S.C. §§ 1985(3), 1988; CONSPIRACY TO DEPRIVE PLAINTIFF OF THE EQUAL PRIVILEGES AND IMMUNITIES UNDER THE LAW.

118.     Plaintiff incorporates all of the Paragraphs stated herein above.

119.     Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities, had as their common purpose to deny Plaintiff equal protection of the law by

terminating Plaintiff's employment, and foreclosing him from any other KSU employment, so that the influential position Plaintiff held in September of 2013, as well as the influential positions he was expected to ascend to [Associate Vice President for Campus Planning and Facilities Management and thereafter Associate Vice President for the Division of Facilities] would not be occupied by an Iranian Muslim.

120.    Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities, gathered, schemed, and fabricated reasons for terminating Plaintiff, and foreclosing him from any other KSU positions, in order to conceal their common purpose set forth in the preceding paragraph.

121.    Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities, carried out the purpose of their conspiracy by terminating Plaintiff's employment on October 10, 2013, and thereafter refusing to consider him for any other KSU positions.

122.    In engaging in the conspiracy against Plaintiff, Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities, acted with malice and in reckless disregard of Plaintiff's rights, and engaged in willful, wanton, and fraudulent conduct by fabricating reasons for termination and for not considering him for other suitable KSU positions, and concealing the real reason (i.e. race and age discrimination) for termination and for not considering him for employment at KSU.

123.    Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities, are liable to Plaintiff for compensatory damages, including lost wages and benefits, emotional distress damages, punitive damages, attorney fees, and prejudgment and post judgment interest.

WHEREFORE, Plaintiff seeks judgment against Defendants Schulz, Mason, Bontrager, and Swanson, in their individual capacities, for compensatory and punitive damages in excess of $75,000 for an unconstitutional conspiracy in violation of 42 U.S.C. § 1985(3), reinstatement to the position he held before his termination (or another comparable and suitable position at KSU), lost future wages and benefits, attorney fees and costs, and for such other and further relief as the Court deems just and equitable.

## VIII.  PLAINTIFF'S FIFTH CAUSE OF ACTION: CONSTITUTIONAL AND CIVIL RIGHTS VIOLATIONS PURSUANT TO 42 U.S.C. §§ 1983, 1988; VIOLATION OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS RIGHTS AGAINST DEFENDANTS SCHULZ, MASON, BONTRAGER, SWANSON, AND FRANZEN.

124.    Plaintiff incorporates all of the Paragraphs stated herein above.

125.    Plaintiff's contract with KSU, KSU's policies, and KSU's practice over Plaintiff's nearly 40-year career, provided Plaintiff with a legitimate expectation that he would continue to be employed by KSU, and would continue to be allowed on KSU's campus and continue to be allowed to perform his job.

126.    Plaintiff's contract with KSU, KSU's policies, and KSU's past practice, provided Plaintiff with a legitimate expectation that, in the event his position with KSU was eliminated, KSU would find him a suitable alternate position.

127.    Plaintiff's contract with KSU, KSU's policies, and KSU's past practice, provided Plaintiff with a legitimate expectation that he would not be subjected to unlawful discrimination based on his race and, in the event he was, a complaint about the same would be immediately investigated by KSU and remedial action would be taken by KSU.

128.    The legitimate expectations described in Paragraphs 120 through 122 herein above constitute protected property interests that could not be taken away by Defendants Schulz, Mason, Bontrager, Swanson, and Franzen, in their individual capacities, without procedural due process.

129.    Defendants Schulz, Mason, Bontrager, Swanson, and Franzen, in their individual capacities and acting under color of state law, failed to provide Plaintiff with procedural due process in connection with depriving him of his property interests.

130.    The decisions made by Defendants Schulz, Mason, Bontrager, Swanson, and Franzen (in their individual capacities and acting under color of state law) in depriving Plaintiff of his property rights were arbitrary and capricious and, thus, violated Plaintiff's substantive due process rights.

131.    The decisions made by Defendants Schulz, Mason, Bontrager, Swanson, and Franzen (in their individual capacities and acting under color of state law) in depriving Plaintiff of his property rights were based on Plaintiff's race, ancestry, and ethnicity of being an Iranian Muslim, and thus violated Plaintiff's substantive due process rights.

132.    The decisions made by Defendants Schulz, Mason, Bontrager, Swanson, and Franzen (in their individual capacities and acting under color of state law) in depriving Plaintiff of his property rights were in retaliation for Plaintiff's complaint of race and age discrimination, and opposing Defendants' unlawful discrimination, and thus violated Plaintiff's substantive due process rights.

133.    Defendants Schulz, Mason, Bontrager, Swanson, and Franzen acted in their individual capacities and under color of state law in depriving Plaintiff of his property rights,

and engaging in purposeful discrimination based on Plaintiff's race, ancestry, and ethnicity in making the decisions to deprive Plaintiff of his property rights and/or ratifying the deprivation decisions, and thus violated Plaintiff's substantive due process rights.

134.   Defendants Schulz, Mason, Bontrager, Swanson, and Franzen's decisions (in their individual capacities and acting under color of state law) to deprive Plaintiff of his property rights based on Plaintiff's race, ancestry, and ethnicity, and based on his complaint of unlawful discrimination, deprived Plaintiff of his equal protection rights under the 14th amendment of the Constitution.

135.   Acting in their official capacities, Defendants Schulz, Mason, Bontrager, Swanson, and Franzen adopted, endorsed, and carried out a policy in order to deprive Plaintiff of his constitutionally protected due process rights, thereby entitling Plaintiff to prospective relief as a result of Defendants' conduct, including reinstatement of Plaintiff to the position he occupied prior to termination.

WHEREFORE, Plaintiff seeks judgment against Defendants Schulz, Mason, Bontrager, Swanson, and Franzen, for compensatory and punitive damages in excess of $75,000, prospective relief by reinstating Plaintiff to the position he held before his termination (or another comparable and suitable position at KSU), lost future wages and benefits, attorney fees and costs, and for such other and further relief as the Court deems just and equitable.

## IX.          DEMAND FOR JURY TRIAL.

Plaintiff hereby demands a trial by jury for the foregoing causes of action.

**X.**     <u>**DESIGNATION OF PLACE OF TRIAL**</u>.

Plaintiff hereby requests that the trial be held at Kansas City, Kansas.

Respectfully submitted:

By:   <u>  s/ Kevin Koc                  </u>.
Patrick G. Reavey, KS# 17291
Kevin Koc KS# 77943
Livestock Exchange Building
1600 Genessee, Suite 303
Kansas City, MO 64102
Ph: 816.474.6300
Fax: 816.474.6302
Email: preavey@reaveylaw.com
Email: kkoc@reaveylaw.com
Website: www.reaveylaw.com
ATTORNEYS FOR PLAINTIFF