## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ABDULLAH ("ABE") FATTAEY,

     Plaintiff,

     v.                                Case No. 15-9314-JAR-KGG

KANSAS STATE UNIVERSITY, ET AL.,

     Defendants.

## MEMORANDUM AND ORDER

Plaintiff Abdullah ("Abe") Fattaey alleges claims against his former employer, Kansas State University, and University employees, relating to the decision not to reappoint him when his annual employment contract expired. Before the Court is Defendants' Motion to Dismiss Second Amended Complaint (Doc. 36). The motion is fully briefed and the Court is prepared to rule. As described more fully below, Defendants' motion is granted in part and denied in part.

## I.    Procedural History; Request for Leave to Amend; Notice of Voluntary Dismissal

Plaintiff originally filed this action on October 13, 2014, and amended the complaint once as a matter of course on November 10, 2015. On May 11, 2016, Plaintiff filed his Second Amended Complaint, after Magistrate Judge Gale granted his motion for leave to amend—the same proposed pleading that had been attached to his motion for leave to amend. It included official capacity claims against Kansas State University, and it contained state law claims against all Defendants. On May 24, 2016, Defendants moved to dismiss the Second Amended Complaint, addressing all of the claims alleged in the Second Amended Complaint.[1] On June 12, 2016, Plaintiff filed a Notice of Voluntary Dismissal (Doc. 45), which states as follows:

---

[1]Defendants had previously filed a motion to dismiss the First Amended Complaint, which was found to be moot after Plaintiff was granted leave to amend. Doc. 34.

Plaintiff, Abe Fattaey, by and through undersigned counsel, pursuant to F.R.C.P.
41(a)(1)(A)(i) hereby dismisses, without prejudice, his claims under the Kansas
Act Against Discrimination and Section 1983 against Kansas State University.
Plaintiff also dismisses without prejudice his Kansas common law civil
conspiracy claim and his Kansas common law tortious interference claim.

In the response to Defendants' motion to dismiss, Plaintiff asks this Court for leave to amend, arguing that he was constrained by Judge Gale's Order to file the proposed pleading attached to his motion for leave to amend, despite his willingness to voluntarily dismiss certain claims contained therein. He also wishes to add allegations to the Title VII claims that he exhausted his administrative remedies. Defendants object to any further amendment, and question the propriety of Plaintiff's notice of voluntary dismissal under Fed. R. Civ. P. 41, which speaks to dismissal of "actions" and not claims. They ask that the Court deem the voluntarily dismissed claims as dismissals with prejudice, instead of without prejudice. The Court declines. The basis for dismissal argued by Defendants for several of these claims was lack of jurisdiction under Fed. R. Civ. P. 12(b)(1). Dismissal on such grounds would be without prejudice. The Court declines to conduct a claim-by-claim analysis based on Defendants' bare request in the reply to determine whether dismissal of certain claims against certain Defendants should be with prejudice, and is satisfied with Plaintiff's notice that these claims will no longer be prosecuted by Plaintiff. As described more fully below, the Court will order Plaintiff to amend once again to eliminate these claims and otherwise conform his Complaint to the Court's rulings in this Order.

Once again, Plaintiff has failed to seek leave to amend in conformity with the local rules.[2] This Court declines to consider Plaintiff's request outside of the context of a properly supported motion. Nonetheless, the Court will order Plaintiff to file another amended pleading that conforms to this Order within ten days, for purposes of making a clear record. The Court also

_____

[2]*See* Doc. 54 (denying Plaintiff's request for leave to amend contained within a motion for hearing on the instant motion to dismiss, for failure to attach a proposed pleading or otherwise comply with D. Kan. R. 15.1).

assumes for purposes of Defendant's exhaustion argument that Plaintiff has properly alleged exhaustion in the Complaint.

## II.      Standards

Defendants argue that Plaintiff failed to administratively exhaust certain Title VII claims, which is a jurisdictional bar to suit.  Federal courts are courts of limited jurisdiction and, as such, must have a statutory or constitutional basis to exercise jurisdiction.[3]  A court lacking jurisdiction must dismiss the case, regardless of the stage of the proceeding, when it becomes apparent that jurisdiction is lacking.[4]  The party who seeks to invoke federal jurisdiction bears the burden of establishing that such jurisdiction is proper.[5]  Mere conclusory allegations of jurisdiction are not enough.[6]

Generally, a subject-matter jurisdiction challenge under Fed. R. Civ. P. 12(b)(1) takes one of two forms: a facial attack or a factual attack.  "First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint.  In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true."[7]

> Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends.  When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations.  A court has wide

---

[3]*Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); *see United States v. Hardage*, 58 F.3d 569, 574 (10th Cir. 1995) ("Federal courts have limited jurisdiction, and they are not omnipotent.  They draw their jurisdiction from the powers specifically granted by Congress, and the Constitution, Article III, Section 2, Clause 1." (citations omitted)).

[4]*Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995).

[5]*Montoya*, 296 F.3d at 955.

[6]*United States ex rel. Hafter, D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999).

[7]*Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) (citation omitted).

discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).[8]

The rest of Defendants' motion argues that Plaintiff's Second Amended Complaint fails to state a claim upon which relief may be granted.  To survive a motion to dismiss for failure to state a claim, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face."[9]  Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[10]  The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires more than "a sheer possibility."[11]

The plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*[12] seeks a middle ground between heightened fact pleading and "allowing complaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' which the Court stated 'will not do.'"[13]  *Twombly* does not change other principles, such as that a court must accept all factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[14]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but]

---

[8]*Id.* at 1003 (citation omitted).

[9]*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

[10]*Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in the original).
[11]*Id.*

[12]550 U.S. 544 (2007).

[13]*Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

[14]*Id.* (citing *Twombly*, 550 U.S. at 556).

we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[15]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[16]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[17]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[18]

## III.   Background

The following facts are alleged in the Complaint, or contained in attachments to the Complaint,[19] and are assumed to be true for purposes of deciding this motion.

Plaintiff Abdullah "Abe" Fattaey was born and raised in Iran; he came to the United States in 1968 to attend college at Defendant Kansas State University ("KSU").  Plaintiff is Muslim, he speaks Farsi and English, and he speaks with a Persian accent.  Plaintiff became a licensed professional engineer and architect after his education at KSU.  He also received a Master's degree in Regional and Community Planning.

Plaintiff began a career at KSU in 1971 as a part-time employee in the Campus Planning and Development Department.  He rose through the ranks and became an Engineering Technician III, then an Engineering Manager, then a Senior Facilities Planning Manager/University Engineer, then an Associate Director/University Engineer, and finally, in

---

[15] *Iqbal*, 556 U.S. at 678.

[16] *Id.* at 678–79.

[17] *Id.* at 679.

[18] *Id.* at 678.

[19] Doc. 33, Exs. A–I; *see Prager v. LaFaver*, 180 F.3d 1185, 1188–89 (10th Cir. 1999) ; *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

2006, he became Director and University Architect.  His job duties included being the "face" of the Campus Planning and Facilities Management Department, and managing all building projects throughout the KSU Manhattan campus.  He consistently interacted with departments throughout KSU, as well as with outside contractors and inspectors working on campus building projects.

Plaintiff always met or exceeded KSU's performance expectations.  His performance evaluation for the calendar year 2011 was positive.  His former supervisor Edward Rice noted: "You do a great job," "your ability to work with supervisors and the Vice President of Administration and Finance speak highly of your capabilities," and "You are a leadership example to the Facilities Planning Operation."[20]

After this performance evaluation was conducted, in October 2012, Defendant Kirk Schulz, who was KSU's President, named Defendant Cindy Bontrager  Interim Vice President. Bontrager became Plaintiff's direct supervisor.  She had previously worked in the KSU Budget Office and had no previous experience working in Plaintiff's department, or in the fields of engineering or architecture.

In April 2013, Plaintiff was formally nominated by one of his colleagues to become the Associate Vice President for Campus Planning and Facilities Management at KSU.  Former Vice President of KSU, Bruce A. Shubert, had previously told Plaintiff that Plaintiff should be the next Associate Vice President for Campus Planning and Facilities Management—this was Plaintiff's goal, and he fully expected to fill the position when Rice, the current Vice President, retired.

Defendants Schulz, Bontrager, and April Mason (KSU's Provost and Senior Vice President), were all aware of Plaintiff's desire to assume this position, but were opposed to his

---

[20]Doc. 33 ¶ 20.

selection.  In order for Plaintiff to become the next Associate Vice President for Campus Planning and Facilities Management, Schulz must appoint him to the position.  But Schulz, Bontrager, and Mason instead formed a selection committee to fill the position and sought applications, including from outside of KSU.  They asked Plaintiff to formally submit an application for the position.

Shortly after Bontrager became Plaintiff's supervisor, Bontrager indicated to Plaintiff that her plan was for Plaintiff to report to the new Associate Vice President for Campus Planning and Facilities Management, indicating that in her opinion, it would be a good thing for Plaintiff because the new Associate Vice President for Campus Planning and Facilities Management would take over all of the public appearances, as well as interactions, communications, and activities with other KSU Departments (formerly part of Plaintiff's duties).  Thus, Plaintiff would have more time to do behind-the-scene work and projects.  But when Plaintiff saw the advertisement for the new Associate Vice President for Campus Planning and Facilities Management, it described all of Plaintiff's job duties almost verbatim, and there was no indication or reference to Plaintiff sharing in the job duties.

On June 4, 2013, Plaintiff was provided, as he had been provided each year before, a "Regular Appointment" contract for the upcoming year.  It was signed by Bontrager and states as follows:

> By authority of the Board of Regents of the State of Kansas and subject to all provisions of the laws of Kansas, the regulations, policies, minutes, and resolutions of the Board of Regents and the rules, regulations, and policies of Kansas State University, Abdullah Abe Fattaey is hereby offered the position of Director/Facilities Planning in Facilities Planning at Kansas State University at 100 percent time at a salary rate of $100,854 beginning June 9, 2013, for the 2014 fiscal year (12 months).
>
> This appointment is subject to annual review, renewal, and notice of non-reappointment in accordance with the regulations and policies of the Board of

Regents and the University. It does not lead to consideration for tenure. This appointment is subject to reassignment of duties upon notice by the appointing administrator.[21]

Plaintiff signed this contract on June 5, 2013.

In the months before hiring the new Associate Vice President for Campus Planning and Facilities Management, Bontrager asked Plaintiff if he thought he was not liked because of his accent, and being from a different country, culture and background.  Plaintiff presumed she was referring to Schulz and Mason not liking him

Plaintiff was not selected for the Associate Vice President for Campus Planning and Facilities Management position.  Instead, the selection committee chose Defendant Ryan Swanson, an outside applicant who was non-Muslim, Caucasian, American-born, and significantly younger than Plaintiff.  Within weeks after Swanson started at KSU, Bontrager told Plaintiff that Swanson didn't believe Plaintiff was needed at KSU any longer.

KSU has a University Policy that addresses and applies to the annual reappointment process of Administrative employees such as Plaintiff.  The Policy provides:

If for any subsequent year, persons holding regular appointments are not to be reappointed, notice will be provided according to the following schedule: . . . .
3.  Persons who have not been granted or do not hold tenure as of June 1, 1982, and who have before that date been in probationary years for administrative tenure are considered on June 1, 1982, to hold appointments to regular positions. There will not be an evaluation or consideration for administrative tenure.  The university has a significant obligation and responsibi1ity to appointees in this category who have completed five years of employment and who have performed well and have made a high caliber contribution to the university.  Therefore, such appointees may expect to be reappointed for each subsequent fiscal year unless program discontinuance or financial stress results in elimination of the position or a performance evaluation results in non-reappointment. The person must be given 12 months' notice if he/she is not to be reappointed.  Should the position be terminated because of program discontinuance or financial stress, the university will make every effort to place the occupant in another suitable position. Those

---

[21]Doc. 33-3, Ex. B.

who receive notice of non-reappointment may appeal through regularly established administrative channels: the president is the final appeal authority. Appeals based on any combination of discrimination, procedural or substantive grounds may be made through the Grievance Chair.[22]

KSU also has a policy on changes to employment contracts, including title changes, which requires them to be submitted with a letter of explanation to the Affirmative Action Office, which will then issue the "initial contract."

On September 23, 2013, Bontrager provided Plaintiff with a signed document titled "2012 Calendar Year Evaluation," which indicated Plaintiff had "Met Expectations" for year 2012. During her meeting with Plaintiff on September 23, 2013, Bontrager also gave Plaintiff a letter dated September 23, 2013, indicating the letter and an attached "Terminal Contract" was notification to him that his employment at KSU would end on September 26, 2014. Bontrager gave no indication to Plaintiff that he could contest her September 23, 2013 notification, or that she would provide him a hearing or otherwise explain to him why his KSU employment was ending. Bontrager did not offer any specific performance problems or complaints with Plaintiff, rather she indicated "they [Defendants Schulz and Mason] want change, and you don't fit in," "they want their own people," "[n]ot a discipline issue, it is time for a change."[23] Plaintiff asked Bontrager during the September 23, 2013 meeting if he could at least work until he turned 65 years of age, to which she indicated she would consider it and get back with him.

On October 1, 2013, Plaintiff submitted a claim of age and race discrimination with KSU's Office of Affirmative Action (now titled "Office of Institutional Equity") based on the September 23, 2013 notice that his employment at KSU would terminate the following September. Also on October 1, 2013, in response to an email from Plaintiff asking whether she

---

[22]Doc. 33-4, Ex. C § C170.3(3).

[23]Doc. 33 ¶ 57.

had reconsidered the decision to terminate, Bontrager emailed Plaintiff and copied Schulz and Swanson to set up a meeting to "discuss [Plaintiff's] role within the Planning Office over the next year."[24]   Plaintiff responded approximately two hours later, informing Bontrager and Schulz that he was pursuing a formal complaint of discrimination against them through the Affirmative Action Office.

Defendant Roberta Maldonado Franzen was the Interim Director of the KSU Office of Affirmative Action when Plaintiff filed his formal complaint of discrimination.  On October 7, 2013, Plaintiff raised concerns with Franzen that the KSU anti-discrimination policy under which Plaintiff's discrimination complaint would be processed meant Schulz and Bontrager would be decision makers as to his complaint, with the final decision belonging to Schulz. Plaintiff also raised concern that there was no provision for him to appeal Schulz's decision as to his discrimination complaint, should it be unsuccessful.  On October 8, 2013, and without starting any investigation, Franzen informed Plaintiff that since his allegations of discrimination were against Schulz and Bontrager, he should contact the Kansas Human Rights Commission ("KHRC").  On October 10, 2013, Franzen indicated to Plaintiff:

> Given that your allegations of discrimination encompass both President
> Schulz and Vice President of Administration and Finance City [sic] Bontrager,
> you should contact the Kansas Human Rights Commission to file a complaint of
> discrimination, rather than participating in our process as described in the
> Policy Prohibiting Discrimination, Harassment, and Sexual Violence. I am not
> aware of any other university policies or procedures that would apply to your
> allegations of discrimination.[25]

Franzen did not pursue Plaintiff's discrimination complaint further; she did not log the complaint as part of KSU's reporting duty.  Defendants made no effort to find Plaintiff a suitable but different position at KSU.

---

[24]Doc. 33 ¶ 63.

[25]Doc. 33 ¶ 68.

On October 10, 2013, Defendant Bontrager held another meeting with Plaintiff, this time with Swanson in attendance.  Bontrager told Plaintiff that she had decided not to change her decision to end Plaintiff's employment at KSU.  Swanson and Bontrager appeared to Plaintiff to be upset at him.  They told him that they "could not move forward with change" if Plaintiff stayed at KSU so they gave him three days to pack up his personal belongings and leave the campus.  Bontrager told Plaintiff by email that he would continue to report to Bontrager but "[a]t this time there are no projects or work for you to complete," and then went on to say that Plaintiff "must make [himself] available for projects as they arise and are assigned to [him]," but he was "not required to be on campus and will not be penalized for not being present at K-State each work day."[26]  Bontrager issued a new letter to Plaintiff that same day:

> We met in person on September 23, 2013 and I hand delivered to you your notice of nonreappointment with the last day of employment on September 26, 2014.  At that meeting you requested further consideration until after you reached the age of sixty-five and I told you I would reconsider.  After careful consideration I have decided to continue with your nonreappointment.  Therefore this letter serves as your official twelve months' notice of nonreappointment pursuant to section Cl70.3 of the Kansas State University Handbook, available at www.ksu.edu/policies. Your last day of employment with Kansas State University will be October 13, 2014.[27]

Despite Plaintiff's many years of service as a KSU employee, there was no celebration or congratulations before he left campus and discontinued actively working for KSU.  No announcement was made publicly or to his colleagues.  Defendants did not contact Plaintiff during that following year to work, nor did they ask him to perform any job duties.

A few months after starting his job at KSU, Swanson was promoted to the position of Associate Vice President for the Division of Facilities, the same position Plaintiff understood he had been groomed for.  The Associate Vice President for the Division of Facilities position was

---

[26]Doc. 33 ¶¶ 77–78.

[27]Doc. 33-9, Ex. H.

not posted, so Plaintiff was not permitted to apply for it, nor was he otherwise considered for the job.

In approximately September 2014, Schulz, Bontrager, Mason, and Swanson advertised for the position of Director/Planning, Projects and Space Management. Although it was a different title than Plaintiff's previous position, it involved the same job duties that he was performing before October 10, 2013. Plaintiff applied for the position, but Schulz, Bontrager, Mason, and Swanson directed that Plaintiff's application be ignored, that he be given no response to his application, and that he should not be considered for the position. The person hired for the position is Caucasian and American-born, had no experience as a University Architect, no experience in a university setting, and had previously worked for the State of Kansas reviewing plans for code compliance.

During Plaintiff's time working under Defendant Bontrager, she repeatedly told him Defendants Schulz and Mason did not like him (but never specified a reason why), wanted him removed, wanted change, and they believed Plaintiff would not fit in with the change they wanted. In all his years working at KSU, the people who held the positions of President and Provost, prior to Schulz and Mason, developed a relationship with Plaintiff, and regularly communicated with him, but Defendants Schulz and Mason never even attempted to do this, and purposefully avoided any contact or interaction with Plaintiff.

## IV.   Discussion

The remaining claims in the Second Amended Complaint are: Count I—Title VII discrimination and retaliation claims against KSU based on race and national origin; Count IV—conspiracy claim under 42 U.S.C. § 1985(3) against Defendants Schulz, Mason, Bontrager, and Swanson in their individual capacities; and (3) Count V—procedural and substantive due process

claims under 42 U.S.C. § 1983 against Defendants Schulz, Mason, Bontrager, Swanson, and Franzen.  All other claims asserted in the Second Amended Complaint have been voluntarily dismissed.  The Court considers Defendants' arguments for dismissal of these remaining claims in turn.

### A.    Title VII Claims

### 1.    Administrative Exhaustion

In the Tenth Circuit, failure to exhaust administrative remedies is a jurisdictional bar to filing suit in federal court.[28]  Because exhaustion of administrative remedies is a jurisdictional requirement, the plaintiff bears the burden of showing exhaustion.[29]  To exhaust administrative remedies, a plaintiff must file a charge of discrimination with either the EEOC or an authorized local agency and receive a right-to-sue letter based on that charge.[30]  The Court must liberally construe the administrative charge to determine whether a particular claim has been exhausted.[31] The inquiry "is limited to the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory acts alleged in the administrative charge."[32]

Plaintiff's December 18, 2013 complaint was dual-filed with the KHRC and the EEOC and alleges discrimination and retaliation on the basis of color, sex, national origin, and age.  The KHRC complaint alleges facts about Plaintiff's lengthy career at KSU, his June 4, 2013 annual contract, the September 23, 2013 terminal contract, Plaintiff's complaint to the Office of

---

[28]*Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005); *Mackley v. TW Telecom Holdings, Inc.*, 296 F.R.D. 655, 665 (D. Kan. 2014).

[29]*McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1106 (10th Cir. 2002).  Defendants raise a factual challenge to the Court's subject matter jurisdiction and submit exhibits in support of their contention that subject matter jurisdiction is lacking: Plaintiff's December 18, 2013 EEOC and KHRC administrative charges, and the KHRC's no probable cause letter.  Doc 37, Exs. B & C.  The Court considers all of these documents in addition to the facts alleged in the Amended Complaint in deciding the motion.

[30]42 U.S.C. § 2000e-5(e); *Mackley*, 296 F.R.D. at 665.

[31]*Jones v. UPS*, 502 F.3d 1176, 1186 (10th Cir. 2007).

[32]*Id.*; *Jones v. Wichita State Univ.*, 528 F. Supp. 2d 1222, 1237 (D. Kan. 2007).

Affirmative Action and Franzen's recommendation to file his complaint with the KHRC, the October 10, 2013 meeting and terminal contract letter, the decision for Plaintiff to pack his belongings and not return to work, Bontrager's comments about Plaintiff not being well liked at KSU, and that Plaintiff was not terminated for performance reasons.  Plaintiff alleged that he was "subjected to harassment, retaliation, and disparate terms, conditions, and privileges of employment due to my race, national origin, ancestry, age, and my complaints about the decisions made with respect to my employment, including my complaint to the Office of Affirmative Action."[33]

Defendants argue that Plaintiff must not be allowed to pursue Title VII discrimination claims outside the scope of the administrative charge.  The Court agrees that matters outside the decisions not to reappoint Plaintiff and to send him home for the duration of his terminal contract, such as a failure to rehire or promote, should be dismissed for failure to exhaust. Plaintiff disavows any claim for failure to hire or promote, but argues that his charge includes the allegation that KSU failed to properly investigate his internal complaint, and that KSU replaced him with a less qualified, Caucasian individual.  The Court disagrees that Plaintiff fairly alleged in the administrative charge that KSU failed to investigate his internal complaint.  To be sure, Plaintiff alleged that he complained of discrimination to the KSU Office of Affirmative Action on September 26, 2013, and that Franzen suggested that he file a complaint with the KHRC.  But Plaintiff included no facts or allegations in his charge that KSU failed to follow guidelines or otherwise was deficient in investigating his internal complaint.  The facts alleged in the administrative charge would not reasonably lead to an administrative investigation about whether KSU's internal investigation complied with its own policies, or otherwise violated Title VII.

---

[33]Doc. 37-3 at 9.

As to KSU's decision to replace Plaintiff with a less qualified Caucasian applicant, the Court finds that this is not a discrete discriminatory act, but instead potentially evidence in support of an element of Plaintiff's claim that he was discriminated against when KSU officials decided not to renew his annual contract and asked him to leave the University for the remainder of his terminal contract. To the extent this is relevant to Plaintiff's nonreappointment claims, the Court will consider this allegation. The Court now proceeds to consider Plaintiff's exhausted claims of discrimination and retaliation under Title VII.

### 2. Discrimination Claim

To establish a prima facie case of discrimination under Title VII, Plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.[34] Defendants move to dismiss this claim on the basis that: (1) failure to reappoint Plaintiff does not constitute an adverse employment action; and (2) there are insufficient factual allegations to support the element of causation.

In *Khalik v. United Air Lines*,[35] the Tenth Circuit provided an extensive analysis of the pleading standard for employment discrimination and retaliation claims under *Twombly*.[36] The court was careful to note that under *Twombly*, the plaintiff is not required to "set forth a prima facie case for each element" to successfully plead a claim of discrimination.[37] Instead, he is only

---

[34]*EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context). In the Tenth Circuit, the prima facie case no longer requires a "similarly-situated person" comparison. *See Sorbo v. UPS*, 432 F.3d 1169, 1173 (10th Cir. 2005). While the third element may be shown by evidence that the employer treated similarly-situated employees more favorably, "such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case." *Id.*

[35]671 F.3d 1188 (10th Cir. 2012).

[36]*Khalik*, 671 F.3d at 1193–94.

[37]*Id.* at 1194.

required to "set forth plausible claims."[38]  The *Khalik* court provided a list of facts an employment discrimination plaintiff could reasonably be expected to know and allege to satisfy the plausibility requirement of *Twombly*, in that case, under the Family and Medical Leave Act ("FMLA"):  (1) who the plaintiff requested FMLA leave from and who denied her, (2) when the plaintiff requested leave and for what purpose, (3) who she complained to about not receiving leave and when she was terminated, (4) how the defendant treated the plaintiff compared to similarly situated individuals, (5) why the reasons given by her employer for her termination were pretextual, (6) what made the plaintiff believe the defendant's actions were connected to discrimination, (7) who the plaintiff complained to about the discrimination, when she complained, and what the response was, and  (8) who criticized the plaintiff's work, what was said, and how she responded to the criticism.[39]  The court was clear that the plaintiff need not provide every fact listed, only that such claims required "some further detail for a claim to be plausible."[40]

The Court easily finds that Plaintiff has plausibly alleged that the nonreappointment decision, and the decision not to allow Plaintiff to return to work during his final year, were adverse employment actions under the Tenth Circuit's liberal definition of the term.[41]  Conduct is an "adverse employment action" when it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[42]  Plaintiff alleges that after working at KSU for decades, and receiving annual regular contracts for years, he was

---

[38]*Id.*

[39]*Id.*

[40]*Id.*

[41]*See, e.g.*, *Stinnet v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003).

[42]*Id.* (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)).

presented with a terminal contract on September 23, 2013, three months after an annual contract was issued, which was explicitly not tied to poor performance. The terminal contract notified Plaintiff that his contract would not be renewed when it terminated in twelve months. These decisions constituted a significant change in Plaintiff's employment status and are thus adverse employment actions.

Next, Defendants urge that Plaintiff fails to allege nonspeculative facts to support his assertion that national origin or race discrimination motivated Defendants' decision not to renew his contract and force him to leave campus for his final year of employment. But the Court agrees with Plaintiff that he has alleged sufficient facts under *Khalik* to state a plausible claim of national origin discrimination. Plaintiff alleges in detail his positive experience at KSU prior to Schulz and Bontrager's appointments, and how he had been recommended and encouraged to pursue the Associate Vice President for Campus Planning and Facilities Management position, and eventually, the Associate Vice President of Division of Facilities position. Plaintiff never had performance issues and his performance evaluations were always positive. Plaintiff alleged that despite believing that Schulz would appoint him to the former position when it became vacant, Schulz, Mason, and Bontrager created a selection committee and required him to submit an application and considered him along with other, outside candidates. Also, Plaintiff alleges that Defendants never planned to consider Plaintiff for this position—Bontrager told Plaintiff "[s]hortly after [she] became Plaintiff's supervisor," that she planned for Plaintiff to report to the "new" Associate Vice President of Division of Facilities, and when that position was posted, it included all of Plaintiff's current job duties.

Additionally, Plaintiff alleges that Bontrager asked him if he believed he was not liked because of his accent, or because of his culture and background. While it is true that a single

stray discriminatory comment is insufficient to support pretext in the summary judgment context,[43] this additional fact alleged in the Second Amended Complaint is sufficient, when coupled with other factual allegations, to plausibly allege a claim of discrimination.  Moreover, at the motion to dismiss stage of the proceedings, the Court cannot conclude that Bontrager's statement was a stray comment.  If Plaintiff can establish a nexus between her comment and the adverse employment action, it may be sufficient to show discriminatory intent.[44]  In sum, because Plaintiff has stated a plausible claim of national origin discrimination under Title VII, Defendants' motion to dismiss this claim is denied.

### 3.    Retaliation Claim

The elements of a prima facie claim of retaliation are: (1) the employee engaged in protected opposition to discrimination; (2) the employee suffered an adverse employment action during or after his protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[45]  The Supreme Court has recently clarified that a Title VII plaintiff asserting a claim of retaliation must show that his protected activity was the but-for cause of the alleged adverse employment action.[46]

Defendants argue that Plaintiff fails to state a claim for retaliation because the protected activity happened after the nonreappointment decision had already been made, because a reasonable person would not find that the nonreappointment with twelve months' notice was materially adverse, and because Plaintiff failed to allege facts that the nonreappointment decision

---

[43]*Minshall v. McGraw Hill Broadcasting Co.*, 323 F.3d 1273, 1282 (10th Cir. 2003).

[44]*Id.*

[45]*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201–02 (10th Cir. 2008); *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

[46]*Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

was retaliatory.  Although the Court agrees that the nonreappointment decision had been made before Plaintiff's protected opposition to discrimination—filing a complaint with the KSU Office of Affirmative Action—the decision not to reconsider nonreappointment and to ask Plaintiff to immediately leave the campus premises was made with knowledge of his protected activity. This later adverse employment action is the focus of Plaintiff's retaliation claim.  An employment action is materially adverse for purposes of a retaliation claim if it would "dissuade a reasonable worker from making or supporting a charge of discrimination."[47]  Plaintiff's factual allegations meet this objective standard.  Assuming the facts alleged are true, while Defendants were considering Plaintiff's request that his nonreappointment be delayed until he turned 65, he filed his internal complaint.  Days later, Plaintiff was told that the reappointment decision would stand, and that instead of working during his terminal contract year, he should pack his belongings and leave.  He alleges that he was not provided with any ceremonial acknowledgement when he left, despite his many years of service at KSU.  The Court finds that these allegations are sufficient to allege a materially adverse employment action.

A Title VII plaintiff asserting a claim of retaliation must show that his protected activity was the but-for cause of the alleged adverse employment action.[48]  Temporal proximity between the protected activity and the adverse employment action, standing alone, is insufficient to establish causation unless the adverse action is followed very closely by the protected activity.[49] If the termination is not very closely connected temporally to the protected activity, the plaintiff must rely on additional evidence of causation.[50]  Here, the adverse employment action took place

---

[47]*Daniels v. UPS*, 701 P.3d 620, 638 (10th Cir. 2012) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (alteration omitted)).

[48]*Nassar*, 133 S. Ct. at 2533.

[49]*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

[50]*Id.*

ten days after the protected activity, which is sufficient to show causation for purposes of establishing a prima facie case of retaliation.[51]  Defendants' motion to dismiss Plaintiff's Title VII retaliation claim is denied.

### B.      Civil Rights Claims

### 1.      Statute of Limitations

The statute of limitations for claims brought under 42 U.S.C. §§ 1983 and 1985(3) are governed by the personal injury statutes for the state in which the federal district court sits.[52] While state law provides the statute of limitations period, federal law determines the date on which the claim accrues and the statute begins to run.[53]  State law also determines any tolling of the limitations period, although federal law may allow for additional tolling in rare circumstances.[54]  Claims brought under §§ 1983 and 1985(3) are characterized as personal injury torts for statute of limitations purposes.[55]  In Kansas, the statute of limitations period for personal injury actions is two years.[56]  Plaintiff concedes that a two-year statute of limitations applies to his civil rights claims.

The issue in this case is when Plaintiff's claims accrued.  Defendants argue that Plaintiff's conspiracy and due process claims accrued on September 23, 2013, and are thus time barred, because the original Complaint was filed on October 13, 2015—more than two years later.  Plaintiff responds that his claims accrued on October 10, 2013, when the second terminal

---

[51]*See, e.g.*, *Shaw v. Tulsa Dynaspan Arrow Concrete*, 408 F. App'x 177, 183 (10th Cir. 2011)

[52]*Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008) (citing *Wilson v. Garcia*, 471 U.S. 251 (1985)); *Graham v. Taylor*, 640 F. App'x 766, 769 (10th Cir. 2016).

[53]*Mondragon*, 519 F.3d at 1078 (citing *Wallace v. Kato*, 549 U.S. 384 (2007)); *Graham*, 640 F. App'x at 769.

[54]*Mondragon*, 519 F.3d at 1078 (citation omitted).

[55]*Wallace*, 549 U.S. at 387; *Garcia v. Wilson*, 731 F.2d 640, 651 (10th Cir. 1984).

[56]K.S.A. § 60-513(a)(4).

contract was issued after considering Plaintiff's request to delay the nonreappointment decision

until he turned 65.  If Plaintiff is correct that the accrual date is October 10, 2013, then his civil

rights claims were timely filed on October 13, 2015.[57]

Under federal law, § 1983 claims generally rely on the common law tort principle that the

claim accrues when the plaintiff  "has a complete and present cause of action, that is, when the

plaintiff can file suit and obtain relief."[58]  "A civil rights action accrues when the plaintiff knows

or has reason to know of the injury which is the basis of the action."[59]  It is not necessary that the

plaintiff know of all the evidence that he ultimately relies on for the statute of limitations to

accrue.[60]

Plaintiff's civil rights claims are premised on the argument that he had a legitimate

expectation that he would continue to be employed by KSU and to perform his job, based on his

contract, and based on KSU's policies and past practices.  Part of his claim is that he expected

that when he complained of discrimination, his complaint would be investigated by KSU and

remedial action would be taken.  Plaintiff also claims he had a property interest in KSU finding

him alternative suitable employment.  The Court agrees that Plaintiff did not know of the injury

that is the basis of this action until October 10, 2016.  Before that date, Plaintiff knew that

Defendants had decided not to reappoint him the following year, a decision he complained about

to the KSU Office of Affirmative Action.  But according to the Complaint, Defendants were

reconsidering whether to defer this decision until Plaintiff turned sixty-five.  It was not until

October 10, when Bontrager informed Plaintiff that after further consideration the original

---

[57]*See* Fed. R. Civ. P. 6(a)(3).

[58]*Wallace*, 549 U.S. at 388 (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Febar Corp. of Cal.*, 522 U.S. 192, 201 (1997)) (citations omitted).

[59]*Price v. Philpot*, 420 F.3d 1158, 1162 (10th Cir. 2005).

[60]*Id.*

decision would stand, and that he learned the decision was final.  In fact, the October 10 letter indicates that it serves as his "official twelve months' notice of non-reappointment."[61]

Moreover, on October 10, not only did Plaintiff learn that the nonreappointment decision was final, but he was told to pack his belongings and leave campus.  Plaintiff did not know, nor did he have reason to know, until October 10, 2013, that his nonreappointment was effectively a buyout for the twelve-month notice period required under KSU's policies.  Plaintiff also did not understand nor would he have reason to know until at least that date that KSU did not investigate his discrimination complaint, and that Plaintiff would not be provided with an alternate job. Finally, Plaintiff did not know until September 2014 that he would not be rehired for a job that was posted with a different title, but that carried the same job responsibilities as his old job. Under these circumstances, the Court agrees that the claims accrued within the two-year statute of limitations.[62]

## 2. Qualified Immunity

Defendants raise the defense of qualified immunity in response to Plaintiff's civil rights claims.  Qualified immunity can apply to claims under §§ 1983 and 1985(3),[63] and gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.[64]  To this end, qualified immunity shields government officials from liability unless the plaintiff shows (1) the defendant's violation of a constitutional right; and (2) that the right the official violated was "clearly established" at the time of the challenged conduct.[65]  "For

---

[61]Doc. 33-9 at 2.

[62]The Court therefore does not reach the question of whether the continuing violation doctrine may apply. The Tenth Circuit has explicitly declined to address whether the doctrine applies to § 1983 claims.  *See Mata v. Anderson*, 635 F.3d 1250, 1253 (10th Cir. 2011).

[63]*Bisbee v. Bey*, 39 F.3d 1096, 1101 (10th Cir. 1994).

[64]*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

[65]*Id.* at 735.

a constitutional right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[66]  A plaintiff may satisfy the "clearly established" requirement "by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'"[67]

The qualified immunity defense must be resolved "at the earliest possible stage of litigation."[68]  For the Court to resolve the issue of qualified immunity at the earliest possible stage of litigation, the complaint must allege enough facts to make clear the grounds on which the claim rests.[69]  It is within the Court's discretion which of the two prongs of the analysis to address first.[70]

### a.    § 1983 Procedural Due Process

To succeed on a procedural due process claim, an individual must prove two elements: first, he possessed a constitutionally protected liberty or property interest such that the due process protections were applicable, and second, that he was not "afforded an appropriate level of process."[71]  "An individual has a property interest in a benefit for purposes of due process protection only if he has a 'legitimate claim of entitlement' to the benefit, as opposed to a mere 'abstract need or desire' or 'unilateral expectation.'"[72]  In the employment context, an employee

---

[66]*Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013) (quoting *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013)).

[67]*Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (quoting *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015)).

[68]*Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008).

[69]*Id.* (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 n.3 (2007)).

[70]*al-Kidd*, 131 S. Ct. at 2080 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[71]*Copelin-Brown v. N.M. State Pers. Office*, 399 F.3d 1248, 1254 (10th Cir. 2005) (internal quotation omitted).

[72]*Teigen v. Renfrow*, 511 F.3d 1072, 1078–79 (10th Cir. 2007) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

"must have 'a legitimate expectation in continued employment.'"[73]  The existence of such an entitlement is generally defined by state law, while federal law "determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause."[74] "State law sources for property interests can include statutes, municipal charters or ordinances, and express or implied contracts."[75]  Under Kansas law, "an employee terminable at the will of his or her employer does not possess a protected property interest in continued employment."[76] But, "an employee terminable only for cause or fault does possess a protected property interest."[77]  And "if state statutes or regulations place substantive restrictions on a government actor's ability to make personnel decisions, then the employee has a protected property interest."[78]

Defendants argue that Plaintiff was an at-will employee, and had no protected property interest in annual reappointment.  Plaintiff responds that he had a protected property interest in continued employment under section C170.3 of KSU's employment policy.  He also argues that he had a protected property interest in continuing to perform his job duties during his final year, and in KSU finding him a suitable alternate position if his position was eliminated.  The Court easily finds that Plaintiff had no protected property interest in either the continuation of his job duties, or in assuming an alternate position at KSU.  There is no basis in statute, contract, or policy that would entitle Plaintiff to continuing his job duties.  Under the October 10 contract,

---

[73]*Maranville v. Utah Valley Univ.*, 568 F. App'x 571, 574 (10th Cir. 2014) (quoting *Hesse v. Town of Jackson*, 541 F.3d 1240, 1245 (10th Cir. 2008)).

[74]*Roth*, 408 U.S. at 577; *Teigen*, 511 F.3d at 1079.

[75]*Schulz v. City of Longmont, Colo.*, 465 F.3d 433, 444 (10th Cir. 2006) (citing *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1128 (10th Cir. 2001)).

[76]*Randolph v. Bd. of Pub. Util. of Kan. City, Kan.*, 983 F. Supp. 1008, 1015 (D. Kan. 1997) .

[77]*Id.*

[78]*Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998).

Plaintiff would continue to draw a salary for twelve months, regardless of whether he performed his job duties.  Plaintiff has supplied no authority to support a protected property interest in performing job duties.[79]  Moreover, KSU's policy on finding a suitable alternate position only applies when the position is "terminated because of program discontinuance or financial stress."[80]  Assuming as true Plaintiff's factual allegations, his position was not eliminated for either of these reasons so this provision would not apply to him.

Therefore, to allege a protected property interest, Plaintiff must show that he possessed a protected property interest in continued employment.  Under K.S.A. § 76-715, employees of Kansas educational institutions are appointed by the chief executive officer, as authorized by the Board of Regents.  "Employees in the unclassified service shall serve at the pleasure of the chief executive officer of the state educational institution, subject to policies approved by the board of regents."[81]  The chief executive officer at KSU is the president.[82]  Under the plain language of Plaintiff's June 2013 Regular Appointment contract, "By direction of the President," and signed by Bontrager, Plaintiff's term was for one year, and "was subject to annual review, renewal and notice of non-reappointment in accordance with the regulations and policies of the Board of Regents and the University."[83]  Plaintiff signed the document under the words "I accept the appointment and agree to be bound by the terms stated therein."[84]  But just a few months later, Plaintiff received an "official twelve months' notice of non-reappointment pursuant to section

---

[79]*Cf. Pitts v. Bd. of Educ. of U.S.D. 305*, 869 F.2d 555, 556 (10th Cir. 1989) (explaining that suspension with pay does not deprive a plaintiff of a "measurable property interest").

[80]Doc. 33-4 at 2.

[81]K.S.A. § 76-715.

[82]K.S.A. § 76-714.

[83]Doc. 33-3.

[84]*Id.*

C170.3 of the Kansas State University Handbook."[85]  Neither Kansas statutory authority nor

Plaintiff's appointment contract created a property interest in employment past the annual term

provided in the annual contract.  In fact, the June contract stated that it was subject to annual

renewal and notice of non-reappointment in accordance with University policies.  The terms of

the contract provided no requirement that the decision not to reappoint after the term concluded

must be for cause, or because the position was eliminated; it merely provided it was subject to

*notice* of non-reappointment in accordance with KSU's policy.  Therefore, the express contract

provided no expectancy of reappointment once Plaintiff's annual term was completed.[86]  Under

both the statute and Plaintiff's contract, his employment was terminable at-will.

In *Board of Regents v. Roth*, the United States Supreme Court considered a procedural

due process claim brought by a non-tenured assistant professor at a state university.[87]  The Court

held that the respondent could not show that he was deprived of a property interest, which "was

created and defined by the terms of his appointment."[88]  In *Roth*, the Court noted that not only

did the respondent's appointment secure no interest in reappointment, but there was not

> any state statute or University rule or policy that secured his interest in re-
> employment or that created any legitimate claim to it.  In these circumstances, the
> respondent surely had an abstract concern in being rehired, but he did not have a
> property interest sufficient to require the University authorities to give him a
> hearing when they declined to renew his contract of employment.[89]

Plaintiff urges that unlike in *Roth*, KSU's policy on continued employment for

administrative appointees supplies an expectation in continued reappointment.  Section C170.3

---

[85]Doc. 33-5 at 2.

[86]*See Bd. of Regents v. Roth*, 408 U.S. 564, 578 (1972).

[87]408 U.S. at 566.

[88]*Id.* at 578.

[89]*Id.* (footnote omitted); *see also Perry v. Sindermann*, 408 U.S. 593 (1972) (holding that institution's policies and procedures could create an implied contract that provided an expectation of continued employment as governed by state law).

of that policy provides that if "persons holding regular appointments are not to be reappointed, notice will be provided according to the following schedule."[90]  The provision includes three subparts.  Subpart (1) provides for the timing of notice during the first two years of service, concluding "[t]hereafter, the individual must be provided 12 months' notice if he/she will not be reappointed."[91]  Subpart (2) applies to persons who hold tenure.  Plaintiff did not hold tenure, so he claims that subpart (3) applies to him.  Subpart (3) applies to those who did not have tenure as of June 1, 1982, "and who have before that date been in probationary years for administrative tenure."  Plaintiff points to language in subpart (3) that appointees in that category "may expect to be reappointed for each subsequent fiscal year unless program discontinuance or financial stress results in elimination of the position or a performance evaluation results in non-reappointment.  The person must be given 12 months' notice if he/she is not to be reappointed."[92]

Defendants tacitly admit that none of the three exceptions listed in this subpart applied to their nonreappointment decision: Indeed, according to the Second Amended Complaint, KSU officials repeatedly told Plaintiff they simply desired change and that the decision was not related to performance.  Nonetheless, Defendants argue that public employment in Kansas is statutory and not contractual, so there can be no implied contract that can give rise to a protected policy interest in reappointment under this KSU policy.  Defendants point to Kansas Supreme Court authority that "the tenure of any office not provided for in the constitution may be declared by statute, and when not so declared such office shall be held at the pleasure of the appointing authority."[93]  The line of cases relied on by Defendants point to a lack of statutory authority

---

[90]Doc. 33-4 § C170.3.

[91]*Id.*

[92]*Id.*

[93]*Stoldt v. City of Toronto*, 678 P.2d 153, 160 (Kan. 1984) (discussing *Leek v. Theis*, 539 P.2d 304 (Kan. 1975)).

allowing cities, or certain state agencies, to modify the applicable statutory mandate of at-will employment.[94]  The statute at issue in this case provides that University employees that are not classified under the Kansas Civil Service Act serve at the pleasure of the chief executive officer, but it includes the caveat that it is "subject to policies approved by the board of regents."

Assuming that the statute does incorporate the KSU policy upon which Plaintiff relies, several cases decided under Kansas law hold that an employee handbook such as the KSU policy here does not create an implied-in-fact contract for continued public employment.[95]  In order for the policy to create an implied contract, there must be some showing of a mutual understanding between the parties for continued employment.[96]  And, even if state law does allow KSU's policy to create an implied-in-fact contract, Plaintiff fails to allege sufficient facts to allow the Court to conclude that the policy applies to him.  He does not allege that he was "in probationary years for administrative tenure prior to June 1, 1982."  Nor is it clear that Plaintiff's position was not eliminated—he alleged that a new title was posted later with the same job responsibilities.  Moreover, the policy at issue here is too vague to give rise to a protected property interest—there are no guidelines under the policy that define the decisionmakers' discretion to terminate an employee "after an evaluation."[97]  The Court thus finds that Plaintiff has failed to allege sufficient facts that he had a clearly established protected property right, as defined by state law, to continued employment under the terms of the KSU employment policy.

---

[94]*See, e.g.*, *Wiggins v. Housing Auth. of Kan. City*, 916 P.2d 718, 720–22 (Kan. Ct. App. 1996); *Randolph v. Bd. of Pub. Util. of Kan. City, Kan.*, 983 F. Supp. 1008, 1015 (D. Kan. 1997).

[95]*See Getz v. Bd. of Cnty. Comm'rs of Shawnee Cnty.*, 194 F. Supp. 2d 1154, 1168 (D. Kan. 2002); *Seifert v. Kan. City Kan. Cmty. Coll.*, No. 08-2427-EFM, 2010 WL 690938, at *6 (D. Kan. Feb. 24, 2010).

[96]*Elam v. Williams*, 753 F. Supp. 1530, 1537 (D. Kan. 1990); *Bash v. City of Galena, Kan.*, 42 F. Supp. 2d 1171, 1180 (D. Kan. 1999).

[97]*See Teigen v. Renfrow*, 511 F.3d 1072, 1081 (10th Cir. 2007) ("Without such details defining the contours of the alleged right and limiting the discretion of the state decisionmakers, these general provisions cannot give rise to a sufficiently definite property interest.").

Assuming *arguendo* that Plaintiff could show a clearly established protected property interest in continued employment under these circumstances, the Court must also determine whether Plaintiff was afforded an appropriate level of process.  Under the Fourteenth Amendment, deprivation of property must "be preceded by notice and opportunity for hearing appropriate to the nature of the case."[98]  This requires some sort of pretermination hearing.[99]  The hearing need not be a full adversarial evidentiary hearing; it is sufficient that the employee has an opportunity to respond and present reasons why the nonreappointment should not happen.[100]  The facts as alleged make clear that Plaintiff was provided with twelve months' notice of the reappointment decision.  He was also provided with face-to-face meetings with Bontrager about the nonreappointment decisions, where she presented him with the terminal contracts and discussed the decision with him.[101]  Under subpart (3) of section C170.3 of the KSU employment policy, Plaintiff was allowed to "appeal through regularly established administrative channels . . . .  Appeals based on any combination of discrimination, procedural or substantive grounds may be made through the Grievance Chair."  Plaintiff does not allege that he pursued an appeal under this provision after he received notice of KSU's decision.  Instead, Plaintiff argues that he was entitled to "a hearing" before the reappointment decision was made, and points to KSU's failure to investigate his discrimination complaint as an indication that KSU officials failed to provide him with the process he was due.

---

[98]*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

[99]*Id.*

[100]*Id.* at 545–46.

[101]*See, e.g.*, *West v. Grand Cty.*, 967 F.2d 362, 367 (10th Cir. 1992) (explaining that an informal in-person meeting with a supervisor before termination may suffice before the adverse employment action); *Powell v. Mikulecky*, 891 F.2d 1454, 1459 (10th Cir. 1989) (explaining that *Loudermill* does not require a delay between the notice and the opportunity to respond).

Plaintiff fails to allege in the Second Amended Complaint that KSU's appeal process was inadequate.  Although he claims he was entitled to a hearing, he has failed to allege that the appeal process would not have provided him with a hearing.  Moreover, *Loudermill* does not require a formal pretermination hearing, nor a full-blown evidentiary hearing, and Plaintiff fails to allege how the process that was available to him falls short of *Loudermill*'s requirements under the circumstances of this case. Therefore, even if Plaintiff's pleading sufficiently alleged deprivation of a property interest in reappointment absent position elimination or a poor performance evaluation, his failure to allege that the *process* provided under the policy was inadequate is fatal to his claim.[102]  Thus, Plaintiff has not met his burden of alleging that Defendants deprived him of the process due under the circumstances of this case, and qualified immunity should be granted to the individual defendants under the first prong of that analysis.

Moreover, even if Plaintiff sufficiently alleged that KSU's appeal process under the policy was inadequate, he has not shown that face-to-face meetings, coupled with the KSU appeal process, violated clearly established law in this context.  He has not shown that the procedures due under the circumstances of this case were sufficiently clear, such that a reasonable official would understand that twelves months' notice, face-to-face meetings, and an appeal process were inadequate.  There is neither Supreme Court nor Tenth Circuit authority that clearly establishes the appropriate level of process under the circumstances of a nontenured University employee terminated in contravention of Board of Regents policy such as the one at issue here.  Thus, Defendants are also entitled to qualified immunity under the second prong.

---

[102]*See Lee v. Regents of Univ. of Cal.*, 221 F. App'x 711, 713 (10th Cir. 2007).

### b.    § 1983 Substantive Due Process

The Due Process clause also contains a substantive component, "barring certain government actions regardless of the fairness of the procedures used to implement them."[103] Substantive due process "provides protection against arbitrary and oppressive government action, even when taken to further a legitimate governmental objective."[104]  There are two ways in which a plaintiff may establish a substantive due process claim.  First, Plaintiff may demonstrate that Defendant violated a "fundamental right or liberty interest."[105]  Second, Plaintiff may show that the government's conduct "shocks the conscience."[106] Plaintiff cannot meet his qualified immunity burden under either test.

First, as described above, there is no clearly established law that Plaintiff enjoys a protected property right in continued employment under these circumstances.  Indeed, the Tenth Circuit has "not decided whether an employee with a property right in state-created employment is protected by the substantive due process clause."[107]  Therefore, the Court determines that under the fundamental rights test, it is not clearly established that Plaintiff's interest in reappointment is a fundamental right protected by the substantive due process clause.  Thus, qualified immunity applies under this strand of the substantive due process doctrine.

Defendants are also entitled to qualified immunity under the shocks-the-conscience test. Under this approach, government conduct will "shock the conscience," when it is "'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'"[108]  The

---

[103]*Seegmiller v. LaVerkin City*, 528 F.3d 762, 766 (10th Cir. 2008).

[104]*Id.* at 767.

[105]*Id.*

[106]*Id.*

[107]*Potts v. Davis Cty.*, 551 F.3d 1188, 1193 n.1 (10th Cir. 2009) (collecting cases).

[108]*Seegmiller*, 528 F.3d at 767 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)).

Court cannot find that Defendants' conduct was arbitrary or conscience-shocking. Plaintiff alleges in the Complaint that when Schulz and Bontrager assumed their new posts as President and Vice-President, they decided not to pursue the previous administration's intention of promoting Plaintiff to the position he desired, and ultimately decided not to renew his contract. Their conduct must have been egregious and arbitrary in order to sustain a substantive due process claim, but Defendants understood that they could opt not to renew Plaintiff's annual contract because they wanted a change, so long as they provided him with twelve-months' notice. And when Plaintiff complained of discrimination to Defendant Franzen, and expressed concern about an investigation that involved the President and a Vice-President of the University, Franzen recommended that Plaintiff pursue a claim with the KHRC. This conduct was not egregious or arbitrary under the applicable standards. Plaintiff has not shown that Defendants' conduct rises to the level of conscience-shocking, nor has he demonstrated that Defendants violated clearly established law under this approach.

### c.      § 1985(3) Conspiracy

Section 1985(3) prohibits persons from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons equal protection under the laws."[109] To state a claim for conspiracy under § 1985, a plaintiff must allege, "(1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom."[110]

---

[109] 42 U.S.C. § 1985(3).

[110] *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993).

To show the element of a conspiracy, Plaintiff must plausibly allege agreement and concerted action among the named Defendants.[111]  But after disregarding the conclusory assertions in the Second Amended Complaint, Plaintiff fails to allege plausible facts to support an agreement to deprive him of equal protection, and that Defendants were motivated by an invidiously discriminatory animus.  Plaintiff alleges the following facts to support a conspiracy: that the individual Defendants formed a search committee for the position of Associate Vice President for the Division of Facilities rather than to promote Plaintiff; that they "gathered, schemed, and fabricated reasons for terminating Plaintiff, and foreclosing him from any other KSU positions"; and that they in fact terminated him.  But these facts do not demonstrate agreement as to a common purpose.  First, although Mason was on the search committee for the position that ultimately went to Swanson, there are no nonconclusory facts alleged that show discriminatory motive on her part.  Also, there is no evidence that Swanson harbored any discriminatory purpose in joining in the decision not to reappoint Plaintiff.  He had not been hired at the time the initial decision was made not to promote Plaintiff to the position he ultimately received.  Although he was present at the second terminal contract meeting, and was copied on certain emails between Bontrager and Plaintiff leading up to that meeting, such conduct does not give rise to an inference of discriminatory motive.  Likewise, there are not facts suggesting Schulz harbored a discriminatory motive in approving the nonreappointment decisions; they merely suggest that he did not like Plaintiff.  The facts alleged fall short of an agreement or concerted action by the individual defendants to act with discriminatory animus.

The only fact alleged that could support a discriminatory motive by any of the Defendants is Bontrager's alleged question to Plaintiff about whether he thought he was not liked

---

[111]*See, e.g.*, *Babbar v. Ebadi*,  No. 99-3040, 2000 WL 702428, at *8 (10th Cir. May 26, 2000); *Sims v. Unified Gov't of Wyandotte Cty./Kan. City, Kan.*, 120 F. Sup. 2d 938, 957 (D. Kan. 2000).

because of his accent, being from a different country, culture, and background.  Plaintiff alleges

that he "presumed" that Bontrager was referring to Schulz and Mason, but this is a purely

conclusory assertion that this Court cannot assume to be true.  The Court can assume as true the

allegation that Plaintiff was not well-liked by the individual Defendants, but such an allegation

does not support discriminatory purpose.  While it may be true that Defendants Mason, Schulz,

and Bontrager agreed to form the search committee and not consider Plaintiff for the position he

desired, there are no facts alleged that would support even an inference about the reason for this

decision, much less that it was concerted action based on discriminatory animus.

The conspiracy must also be motivated by "some racial or perhaps otherwise class-based

invidious discriminatory animus."[112]  As Defendants argue, the Supreme Court has determined

that § 1985(3) class-based discrimination does not reach economic or commercial animus.[113]

Neither the Supreme Court nor the Tenth Circuit has decided whether § 1985(3) reaches class-

based animus other than race.[114]  Therefore, even if the Court found that Plaintiff could plausibly

allege a violation of clearly established law under the other elements of his § 1985(3) claim, to

the extent he alleges discrimination based on his national origin, he could not demonstrate that

the law is clearly established that § 1985(3) protects him.

Finally, Plaintiff's conspiracy claim is foreclosed by *Great American Federal Savings &
Loan Association v. Novotny*.[115]  In that case, the Supreme Court explained that a violation of

---

[112]*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993).

[113]*United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 838–39 (1983).

[114]*Tilton*, 6 F.3d at 686 (quoting *Scott*, 463 U.S. at 836; *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993) (declining to decide whether women in general is a qualifying class under § 1985(3)).  Other circuits have determined that national origin and gender are protected classes under the statute. *See, e.g.*, *Cole v. Sharp*, 898 F. Supp. 799, 802 (D. Kan. 1995) (quoting *Hicks v. Resolution Trust Corp.*, 970 F.2d 378, 382 (7th Cir. 1992)); *Vakilian v. Shaw*, 335 F.3d 509, 519 (6th Cir. 2003).

[115]442 U.S. 366 (1979).

34

Title VII cannot be asserted through § 1985(3).[116]  As the Court has already explained, Plaintiff cannot vindicate his due process rights under § 1983 against the individual defendants under the doctrine of qualified immunity.  That leaves his claims of national origin discrimination and retaliation, which are coterminous with his Title VII claims.  But as the Court explained:

> [W]e conclude that § 1985(3) may not be invoked to redress violations of Title VII.  It is true that a § 1985(3) remedy would not be coextensive with Title VII, since a plaintiff in an action under § 1985(3) must prove both a conspiracy and a group animus that Title VII does not require.  While this incomplete congruity would limit the damage that would be done to Title VII, it would not eliminate it. Unimpaired effectiveness can be given to the plan put together by Congress in Title VII only by holding that deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3).[117]

Plaintiff responds by arguing that the right to be protected from race discrimination in his employment is not a right created solely by Title VII, and cites cases holding that §§ 1981 and 1983 claims are appropriate predicates for § 1985(3).[118]  But *Novotny* counsels that § 1985(3) "provides *no* substantive rights itself; it merely provides a remedy for violation of the rights it designates."[119]  It concludes that Title VII provides the exclusive remedy for deprivations of the rights created therein.[120]  The cases cited by Plaintiff are inapposite because he does not assert a claim under § 1981, and his § 1983 claims not only have been dismissed, but assert independent rights based on the due process clause, not the equal protection clause.

---

[116]*Id.* at 378.

[117]*Id.*

[118]*Garza v. City of Omaha*, 814 F.2d 553, 557 (8th Cir. 1987) (allowing § 1985(3) claim to redress constitutional violations); *Baker v. McDonald's Corp.*, 686 F. Supp. 1474, 1481 (S.D. Fla. 1987) (explaining that a claim "predicated on a deprivation of equal protection rights guaranteed by [Title VII] must fail," but allowing claims to proceed under § 1981 to remedy a violation of the Thirteenth Amendment), *aff'd*, 865 F.2d 1272 (11th Cir. 1988); *Sims v. Unified Gov't of Wyandotte Cty./Kan. City, Kan.*, 120 F. Sup. 2d 938, 958 (D. Kan. 2000) (denying motion to dismiss § 1985(3) claim involving race discrimination without addressing *Novotny*, where §§ 1981 and 1983 claims were also asserted).  *See generally Meade v. Merchants Fast Motorline, Inc.*, 820 F.2d 1124 (1987) (explaining that Title VII does not displace or preempt § 1981 to remedy race discrimination in employment).

[119]*Novotny*, 442 U.S. at 372 (emphasis added).

[120]*Id.* at 378.

In sum, the Court agrees that Plaintiff's claim under § 1985(3) must be dismissed because the individual Defendants enjoy qualified immunity.

**V.      Conclusion**

After several rounds of amendments and other adjustments to his claims, Plaintiff is left with Title VII claims of national origin discrimination and retaliation against KSU.  His civil rights claims against the individual Defendants are subject to qualified immunity and must be dismissed.  All other claims in the Second Amended Complaint have been withdrawn.  Plaintiff has requested leave to file another amended pleading to make clear that he has voluntarily dismissed certain claims since the Second Amended Complaint was filed, and to properly plead administrative exhaustion on his Title VII claims.  The Court agrees that an amended pleading is warranted to make the record clear as to what remains.  Plaintiff's Third Amended Complaint shall be filed within seven days and shall omit the claims Plaintiff voluntarily dismissed, add his administrative exhaustion allegations, and omit the civil rights claims dismissed herein based on the doctrine of qualified immunity.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Dismiss Second Amended Complaint (Doc. 36) is **granted in part and denied in part**. Defendants' motion is granted as to Plaintiff's claims under 42 U.S.C. § 1983 and 1985(3). Plaintiff's civil rights claims are dismissed with prejudice.  The motion is denied as to Plaintiff's claims under Title VII.

**IT IS FURTHER ORDERED BY THE COURT** that Plaintiff shall file his Third Amended Complaint in accordance with this Order within seven (7) days.

**IT IS SO ORDERED.**

Dated: January 24, 2017

36

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE